# EXHIBIT 6

2003 WL 22271639
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

DATA BASED SYSTEMS
INTERNATIONAL, INC., Plaintiff,
v.
HEWLETT PACKARD, Defendant.

No. Civ.A. 00–CV–04425.
|
Sept. 30, 2003.

**Attorneys and Law Firms**

John S. Harrison, On behalf of Plaintiff Data Based Systems International, Inc.

Michael J. Holston, and David J. Antczak, On behalf of Defendant Hewlett Packard.

*OPINION*

GARDNER, J.

***1** This matter is before the court on the oral motion for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure made by defendant on April 17, 2003, at the close of plaintiff's case-in-chief in a non-jury trial before the undersigned. For the reasons expressed below we grant the motion and enter judgment in favor of defendant Hewlett Packard ("HP") and against plaintiff Data Based Systems International, Inc. ("DBS") on both counts of plaintiff's Complaint.

*PROCEDURAL BACKGROUND*

Plaintiff commenced this action on July 15, 2000 by filing a Complaint alleging breach of contract and tortious interference with a prospective contractual relationship. The Complaint was filed in the Court of Common Pleas of Northampton County, Pennsylvania. On August 3, 2000 defendant filed a Notice of Removal to this court asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).[1] In Count I of its Complaint, plaintiff alleges two distinct breaches of contract and, in Count II, plaintiff alleges that defendant tortiously interfered with a prospective contractual relationship.

A two-day non-jury trial was held before the undersigned on April 17, 2003 and July 7, 2003. At the close of plaintiff's case-in-chief and again at the close of all evidence, defendant orally moved for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. In the interest of efficiently taking the testimony of certain out-of-state witnesses, the undersigned deferred its ruling on this motion until the close of all evidence at which time defendant renewed its motion. The parties agreed to combine argument on defendant's motion for judgment as a matter of law with closing argument. Upon conclusion of the non-jury trial, the undersigned took the matter under advisement.

We now grant defendant's oral motion for judgment as a matter of law made at the close of plaintiff's case-in-chief. In addition, we deny as moot defendant's oral motion raised at the close of all evidence.

*FINDINGS OF FACT*

On April 1, 2003 the parties filed a Joint Set of Agreed–Upon Findings of Fact in connection with the non-jury trial. In that document, the parties agreed to all facts as found by United States District Judge Franklin S. Van Antwerpen[2] in the Opinion[3] accompanying his September 24, 2001 Order disposing of defendant's motion for summary judgment.

*Breach of Contract Claim*

*Reseller Agreement*

From the mid–1980s until the spring of 2000 and through a series of reseller agreements, DBS acted as an authorized reseller of HP's computer products and services. (W. Bachenburg Deposition at 11, 21.) Under the reseller agreements, DBS sold products manufactured by HP to DBS's customers, so-called "end-users." The last reseller agreement (hereinafter "Reseller Agreement") between the parties was signed by the President and Chief Executive Officer of DBS, William A. Bachenburg, on April 26, 1999. This agreement had a term of approximately one year and did not have any mandatory renewal provision. (Reseller Agreement at § 1B.) In 2000, HP chose to allow the Reseller Agreement to expire

Case 1:25-cv-00690-KMN   Document 82-7   Filed 08/20/25   Page 3 of 11
Data Based Systems Intern., Inc. v. Hewlett Packard, Not Reported in F.Supp.2d (2003)
2003 WL 22271639

on its designated termination date of May 31, 2000. (K. Archer Deposition at 92, 124, 154.)

*Support Services Agreement*

*Relationship Between DBS and HP*

**\*2** On April 22, 1996, the parties entered into another, separate agreement, the Support Services Agreement ("SSA"). Pursuant to this agreement, DBS sold to its customers, and HP provided to such end-users, support services. (W. Bachenburg Deposition at 62.) These services included such services as hardware maintenance and telephone question-and-answer assistance, provided to the end-users. (*Id.* at 58.) DBS would act as an intermediary, entering into separate support agreements with each end-user. (P. Brady Deposition at 79.) When an end-user sought services under a support agreement with DBS, DBS would order the services from HP on the customer's behalf. (*Id.* at 77–78.) These orders for service were subject to HP's acceptance. (Support Services Agreement for HP Resellers at § 4.) If HP decided to provide services, it would quote a price for services which DBS then had the opportunity to accept by issuing a purchase order to HP. (C. Annoni Deposition at 24–26; P. Brady Deposition at 77.)

*Terms of Support Services Agreement*

The SSA continued for a period of one year from the effective date of commencement. (Support Services Agreement for HP Resellers at § 14a.) Thereafter, the SSA automatically renewed "for successive one (1) year terms until terminated by either party upon ninety (90) days' written notice." (*Id.*) Additionally, the SSA allowed HP (1) to terminate the SSA or any provision of services under any order at any time if DBS materially breached the SSA or any other agreement with HP, provided that HP notified DBS of the breach and gave DBS thirty days to cure the breach, and (2) to terminate the SSA immediately if, in HP's opinion, DBS's performance of its obligations under the SSA created customer satisfaction problems or administrative problems for HP. (*Id.* at §§ 14d. and e.) The SSA further provided that "[t]he minimum term of any order is twelve full months unless otherwise agreed, and all orders will continue until terminated by either party under the provisions of this Support Agreement." (*Id.* at 14f.)

*HP's Termination of Support Services Agreement*

Upon learning in the spring of 2000 that HP was going to allow the Reseller Agreement to expire, HP's management responsible for DBS's support services account decided to terminate the SSA pursuant to section 14a. of the SSA. (D. Hoppenrath Deposition at 46–51.) On May 31, 2000, HP wrote a letter to DBS, notifying DBS that HP was electing to terminate the SSA in ninety days, which termination would become effective August 29, 2000. The letter explained that through August 29, 2000, the end of the notification period, HP would "continue to conduct business according to the terms of the SSA between the parties." (Termination Letter from Dale Hoppenrath to William Bachenburg, Dated May 31, 2000.) However, the letter further provided that "all requests to provide support agreements for DBS's end-users will have an expiration date of 12/31/00." (*Id.*) HP would extend service beyond December 31, 2000, for a period not to exceed twelve months from their start date, only as to "pre-existing, active agreements extending beyond 12/31/00." (*Id*.)

**\*3** DBS placed orders for support services on behalf of its customers during the period of May 31, 2000 through August 29, 2000. (C. Annoni Deposition at 116–118; A. Fernandez Deposition at 44–45; D. Hoppenrath Deposition at 50; K. Yaros Affidavit at ¾ 18.) According to DBS, HP's termination of the orders placed within the notification period on December 31, 2000 cut short the ordinary one-year term and caused DBS business losses. (Defendant's Brief at 6.)[4]

*Tortious Interference with*
*Prospective Contractual Relations*

Beginning in or around 1996, DBS made sales of HP products to certain divisions of Ingersoll–Rand. (W. Bachenburg Deposition at 47–49; R. Hicks Deposition at 25–28.) In or around November of 1999, Raymond Gaj, a technical analyst for Ingersoll–Rand's Tool & Hoist Division, was instructed to purchase several HP workstations; he thereafter asked DBS's Vice President of Sales, Robert Hicks, to provide a price quotation on the desired workstations. (R. Gaj Deposition at 57; R. Hicks Deposition at 35.) Mr. Hicks provided a price quotation and later a formal proposal that contemplated a sale of nine computer workstations at a discount of twelve percent, for a total sale price of $126,114.84. (Formal Proposal, Order Number 500108, Dated Jan. 11, 2000.) After Mr. Gaj received

the quotation and proposal, but before he made a commitment to DBS, one of Mr. Gaj's superiors instructed him to contact Gregory McDonald, an Ingersoll–Rand corporate manager. (R. Gaj Deposition at 23–24; G. McDonald Deposition at 19–20.)

According to HP, Mr. McDonald, believing that Ingersoll–Rand received inconsistent pricing when it bought through resellers, had, in 1999, begun to develop a new business strategy whereby Ingersoll–Rand would instead buy from HP directly, which strategy he expected would ultimately result in Ingersoll–Rand's obtaining greater price consistency and larger discounts than those offered by resellers. (G. McDonald Deposition at 9–10, 13–14, 18.) Defendant asserts that in an effort to reach the envisioned end of entering into a "global agreement" with HP, Mr. McDonald directed Mr. Gaj to purchase the workstations from HP directly, instead of through a reseller like DBS. (*Id.* at 24–25, 35, 38–39.) Mr. McDonald referred Mr. Gaj to an HP sales representative, Phillip Blackley. (*Id.* at 21–25, 38–39; R. Gaj Deposition at 97–98.) Mr. Blackley obtained approval to offer to sell the nine desired workstations to Ingersoll–Rand at a discount of twenty percent, for a total price of $112,755.61. (Hewlett Packard Quotation, Quote Number 4R9–21629–05, Dated Jan. 20, 2000.) On or about January 20, 2000, Mr. Gaj accepted this offer from HP. (*Id.*)

### SUMMARY JUDGMENT

By Order dated September 24, 2001, Judge Van Antwerpen granted in part and denied in part the Motion for Summary Judgment of Defendant Hewlett–Packard Company filed on July 2, 2001. [5] Judge Van Antwerpen's September 24, 2001 Order held as follows:

**\*4** 1. With respect to the breach of contract claim, we find:

   a. Defendant did not breach the Support Services Agreement by terminating the Support Services Agreement without cause upon ninety days' notice;

   b. Defendant did breach the Support Services Agreement by not providing support services to Plaintiff's Customers on Orders Placed Before August 29, 2000; and

   c. Plaintiff's damages are limited to "refund of related support charges paid during the period of breach, up to a maximum of twelve (12) months" as provided by Section 11b. and 11g. of the Support Services Agreement.

   2. With respect to the intentional interference with prospective contractual relations claim, we find that the claim may go forward because there are genuine issues of material fact that preclude the granting of summary judgment in Defendant's favor. [6]

Regarding plaintiff's breach of contract claim, Judge Van Antwerpen determined that HP did not breach the SSA when it terminated the SSA after providing 90 days' notice. [7] However, Judge Van Antwerpen did find that HP breached § 14f of the SSA by refusing to provide services for a full year on those orders placed during the notification period from May 31, 2000 to August 29, 2000. [8]

Given Judge Van Antwerpen's rulings on Count I, the only breach of contract issue remaining for trial was what damage, if any, defendant caused to plaintiff by refusing to provide services for a full year on those orders placed during the notification period. Even that issue, however, was limited by Judge Van Antwerpen's ruling that plaintiff's damages are limited by the SSA to a refund of related support charges paid during the period of breach, up to a maximum of twelve months. [9]

In reviewing plaintiff's tortious interference claim, Judge Van Antwerpen found genuine issues of material fact requiring a trial of this count of the Complaint. He found the elements of the claim under Pennsylvania law [10] to be: 1) the existence of a prospective contractual relationship between plaintiff and a third party; 2) purposeful action on the part of defendant, specifically intended to harm plaintiff by preventing the prospective relationship from occurring; 3) the absence of a privilege or justification on the part of the defendant; 4) actual legal damages resulting from defendant's conduct; and 5) a reasonable likelihood that the relationship would have occurred but for defendant's interference. [11] Additionally, Judge Van Antwerpen ruled that plaintiff's tortious interference claim is not constricted by any limitation of liability clause. [12]

Accordingly, this action proceeded to trial before the undersigned on the limited issues of plaintiff's damages on Count I and liability and damages on Count II.

*FINDINGS OF FACTS ADDUCED AT TRIAL*

Based upon the testimony offered, and the exhibits introduced, at trial, the undersigned makes the following findings of fact:

1. The date of any particular service agreement between DBS and any end-user is the first date HP invoiced DBS for such services. [13]

 *5  2. From May 31, 2000 to August 29, 2000, DBS entered into 34 separate support agreements with end-users subject to DBS's SSA with HP. [14]

3. Of those support agreements entered between May 31, 2000 and August 29, 2000, thirteen co-terminated on December 31, 2000. [15]

4. ___ DBS entered into 21 support agreements between May 31, 2000 and August 29, 2000 with Paymentech as end-user. [16]

5. Three of DBS's support agreements with Paymentech were cancelled prior to December 31, 2000 and the remaining eighteen support agreements had a June 30, 2001 co-termination date. [17]

6. The eighteen support agreements entered into between DBS and Paymentech between May 31, 2000 and August 29, 2000 which were not cancelled prior to December 31, 2000 were not permitted to run for the full twelve months as required by the terms of the SSA between DBS and HP. [18]

7. At the time that DBS entered into each of the 21 support agreements with Paymentech between May 31, 2000 and August 29, 2000, DBS was on notice from HP that support services would not be provided after December 31, 2000. [19]

8. DBS made no payments to HP before December 31, 2000 for services which were not ultimately provided to any end-user, including Paymentech. [20]

9. DBS made no payments to HP for support services after December 31, 2000. [21]

10. HP's proposal for the sale of nine technical workstations to Ingersoll–Rand was based on a configuration of the nine workstations similar to that configuration found in DBS's proposal to Ingersoll–Rand. [22]

11. The configuration on which HP's proposal was based was determined based on information provided to HP from Ingersoll–Rand. [23]

12. HP submitted its final quotation for the sale of nine workstations to Ingersoll–Rand on January 20, 2000 before learning of DBS's efforts to sell the same nine workstations to Ingersoll–Rand. [24]

*CONCLUSIONS OF LAW*

1. Section 11b of the SSA constitutes a valid limitation of liability clause.

2. Section 11g of the SSA precludes plaintiff from recovering any incidental or consequential damages.

3. DBS suffered no compensable damages on any support agreement entered between DBS and any end-user prior to May 31, 2000 because all such support agreements were permitted to run until their agreed upon termination date.

4. DBS suffered no compensable damages on any support agreement entered between DBS and any end-user from May 31, 2000 to August 29, 2000 which stated the agreed upon co-termination date of December 31, 2000 because no such support agreement was cut short by any action of HP.

5. DBS suffered no compensable damages on any support agreement entered between DBS and any end-user from May 31, 2000 to August 29, 2000 on which DBS paid HP prior to December 31, 2000 to perform support services because such services were in fact performed by HP.

6. DBS suffered no compensable damages on any support agreement entered between DBS and any end-user from May 31, 2000 to August 29, 2000 on which DBS paid HP after December 31, 2000 to perform support services because DBS did not make any payment to HP after December 31, 2000.

**\*6** 7. In contracting with Ingersoll–Rand for the sale of nine HP workstations, HP did not purposely act specifically intending to harm DBS.

## DISCUSSION

As mentioned above and further explained below, this court finds that plaintiff suffered no damages from defendant's breach of the SSA and that defendant did not tortiously interfere with plaintiff's prospective contractual relationship with Ingersoll–Rand.

### Breach of Contract

As explained above, Judge Van Antwerpen has already determined that defendant did not breach the SSA when it terminated the SSA after providing 90 days' notice, but that defendant did breach the SSA by refusing to provide services for a full year on those orders placed during the notification period from May 31, 2000 to August 29, 2000. [25] Pursuant to Judge Van Antwerpen's ruling, California law governs this cause of action and the elements for a breach of contract claim are: "(1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach and (4) resulting damages to plaintiff." [26] Judge Van Antwerpen did not determine the fourth element of plaintiff's breach of contract claim.

At issue in the trial before the undersigned was the limited issue of determining this fourth element—damages to plaintiff caused by defendant's refusal to provide services for a full year on those orders placed during the notification period. Such damages, however, are limited by section 11b of the SSA to a refund of related support charges paid during the period of breach, up to a maximum of twelve months. [27]

Moreover, pursuant to section 11g of the SSA, such damages are plaintiff's sole and exclusive remedy and "[e]xcept as indicated above, in no event will HP or its subcontractors be held liable for loss of data or for direct, special, incidental, consequential (including lost profit), or other damage, whether based in contract, tort, or otherwise." [28]

Prior to considering the evidence presented by plaintiff on its damages resulting from the breach, plaintiff asked this court to consider three alternative interpretations of the limitation of liability clauses contained in section 11 of the SSA. [29] First, plaintiff argues that section 11b is a liquidated damages provision entitling plaintiff to a refund of all service fees paid by DBS to HP for the twelve months preceding the breach. In the alternative, plaintiff argues that section 11b, read in conjunction with section 11g, simply reflects a ceiling on the direct, consequential, and incidental damages that plaintiff can recover—no more than the amount of all service fees paid by DBS to HP for the twelve months preceding the breach. Finally, plaintiff argues that the contract is ambiguous as to the limitations on plaintiff's damages because section 11g is rendered meaningless by interpreting section 11b as limiting plaintiff's damages to a refund of service fees paid by DBS to HP.

For the reasons explained below, the court rejects all three proposed interpretations. Instead, the court finds that section 11b clearly and unambiguously constitutes a valid limitation of liability clause and that section 11g clearly and unambiguously precludes plaintiff from recovering any incidental or consequential damages.

**\*7** Plaintiff's argument that section 11b is a liquidated damages clause, rather than a limitation of liability clause is without merit, as the subsection clearly and unambiguously refers to limiting HP's liability. Section 11 of the SSA is entitled "Limitation of Remedies and Liability", unmistakenly identifying the parties' intentions that this section constitute a limitation of liability clause.

Moreover, the language of section 11b plainly identifies this as a limitation of liability clause, providing that, "[f]or any material breach of this Support Agreement by HP, Reseller's remedy and HP's liability will be limited to refund of related support charges paid during the period of breach, up to a maximum of twelve (12) months."

Finally, Judge Van Antwerpen understood section 11b to be a limitation of liability clause, as he clearly referred to it as such in his September 24, 2001 Opinion and Order. [30] Thus, we conclude that the language contained in section 11b constitutes a limitation of liability clause, not a liquidated damages provision.

Plaintiff's alternative argument that section 11b, when read in conjunction with section 11g, actually constitutes a ceiling on the amount of direct, special, incidental, consequential (including lost profit), or other damages recoverable by plaintiff is also without merit. The plain

meaning of section 11b limits recovery to a refund only, as it states, "THE REMEDIES PROVIDED HEREIN ARE RESELLER'S SOLE AND EXCLUSIVE REMEDIES. EXCEPT AS INDICATED ABOVE, IN NO EVENT WILL HP OR ITS SUBCONTRACTORS BE LIABLE FOR LOSS OF DATA OR FOR DIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL (INCLUDING LOST PROFIT), OR OTHER DAMAGES, WHETHER BASED IN CONTRACT, TORT, OR OTHERWISE."

Section 11g clearly constitutes a prohibition on the recovery of any damages other than those contemplated by sections 11a through 11f of the SSA. When read in conjunction with section 11b, section 11g simply provides that plaintiff can recover those direct damages contemplated by section 11b, but no others. It certainly does not open the door for plaintiff to recover indirect damages up to the value of a refund of twelve months' service fees. [31]

Plaintiff's final argument is that section 11 of the SSA is ambiguous because reading section 11b as a limitation of liability clause, rather than a ceiling, renders section 11g meaningless. This argument is without merit. Section 11g plainly precludes all damages not expressly permitted elsewhere in section 11. As explained above, it is in no way ambiguous. Moreover, the fact that the current scenario only permits direct damages under section 11b, does not render section 11g meaningless because there may be other scenarios in which other damages are recoverable, but for which the parties sought nonetheless to limit plaintiff's damages.

Having denied all of plaintiff's arguments to the contrary, therefore, this court determines that section 11g precludes all direct and indirect damages not permitted elsewhere in section 11. In addition, section 11b is a limitation of liability clause which restricts plaintiff's damages to a refund of related support charges paid during the period of breach, up to a maximum of twelve months. Thus, plaintiff can recover damages only for support charges paid for services not rendered by HP on contracts commenced by DBS during the notification period. [32]

*8 During the notification period, DBS commenced 34 contracts with various end-users. [33] Of these 34, thirteen co-terminated on December 31, 2000 and would not have gone beyond that date even absent defendant's breach. [34] The 21 service agreements which did not co-terminate on December 31, 2000 were all with a single end-user—Paymentech. [35]

Eighteen of DBS's service agreements with Paymentech should have been permitted to run from July 1, 2000 through June 30, 2001, but were cut short by defendant's breach. [36] However, DBS did not pay any service charges to HP on any Paymentech contract, or any other contract ending on December 31, 2000, after December 31, 2000. [37] Because defendant provided services in exchange for all service charges paid prior to December 31, 2000 and no service charges were paid after December 31, 2000, plaintiff is not entitled to a refund. Plaintiff essentially mitigated its own damages, as it was required to do, to zero.

Because plaintiff suffered no damages as a result of defendant's breach, plaintiff has not proven the final element of a cause of action for breach of contract and thus failed to sustain its burden of proof on Count I for breach of contract. See *Reichert v. General Insurance Company of America,* 442 P.2d 377, 381 (Cal.1968). Thus, this court granted defendant's motion for judgment as a matter of law made at the close of plaintiff's case-in-chief. [38]

*Tortious Interference with*
*Prospective Contractual Relations*

In his September 24, 2002 decision, Judge Van Antwerpen determined that Pennsylvania law governs plaintiff's claim for tortious interference with prospective contractual relations. He stated the elements of the claim under Pennsylvania law as follows: 1) the existence of a prospective contractual relationship between plaintiff and a third party; 2) purposeful action on the part of defendant, specifically intended to harm plaintiff by preventing the prospective relationship from occurring; 3) the absence of a privilege or justification on the part of the defendant; 4) actual legal damages resulting from defendant's conduct; and 5) a reasonable likelihood that the relationship would have occurred but for defendant's interference. [39] This court finds that plaintiff failed to establish the last four elements of its claim for tortious interference. [40]

Plaintiff failed to demonstrate defendant's purposeful action specifically intended to harm plaintiff by preventing the prospective relationship between DBS and Ingersoll–Rand from occurring. Although plaintiff proved that defendant learned on the same day that it submitted its final quotation for the sale of nine workstations to Ingersoll–Rand that DBS

Case 1:25-cv-00690-KMN    Document 82-7    Filed 08/20/25    Page 8 of 11
Data Based Systems Intern., Inc. v. Hewlett Packard, Not Reported in F.Supp.2d (2003)
2003 WL 22271639

had already submitted a proposal to Ingersoll–Rand for the same workstations,[41] plaintiff presented no evidence that HP was aware of DBS's interest in the proposed sale of nine workstations to Ingersoll–Rand prior to HP's submission of its own final quotation to Ingersoll–Rand.

**\*9** Moreover, while DBS presented evidence that HP's proposal was based on a configuration identical to that formulated by DBS in its proposal,[42] there is no evidence to suggest that HP ever had possession of DBS's proposal or DBS's configuration. The evidence supports a finding that HP capably developed a similar configuration based on the information that Ingersoll–Rand provided to HP or received an identical configuration from Ingersoll–Rand,[43] but does not support the implication that HP did so with knowledge of DBS's configuration. Without such proof, plaintiff could not establish the second factor of its claim because it cannot show defendant's purposeful action with specific intent.

While the court cannot conceive of any privilege or justification by which defendant HP would be permitted to interfere with the prospective contractual relationship between DBS and Ingersoll–Rand, DBS failed to affirmatively demonstrate the absence of such privilege in satisfaction of its burden on this third element.

Additionally, plaintiff failed to prove the fourth element of this cause of action—actual damages caused by defendant's conduct. While plaintiff presented evidence of damages resulting from its failure to win the Ingersoll–Rand contract,[44] plaintiff has not shown that this was caused by defendant's conduct. There may have been any number of reasons why Ingersoll–Rand would choose not to award the contract to plaintiff.

Finally, plaintiff failed to prove the fifth element of a tortious interference claim. Plaintiff presented no evidence that Ingersoll–Rand would have awarded the contract to DBS but for HP's interference. Based on plaintiff's failure to carry its burden on the last four elements of its claim of tortious interference, the court granted defendant's motion for judgment as a matter of law raised at the close of plaintiff's case-in-chief.[45]

*CONCLUSION*

For all the foregoing reasons, we grant defendant's oral motion for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, and enter judgment in favor of defendant on Counts I and II of the Complaint.

*ORDER*

NOW, this 30th day of September, 2003, upon consideration of defendant's oral motion for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure made at the close of plaintiff's case-in-chief on April 17, 2003 and again at the close of all evidence on April 17, 2003; after a non-jury trial held on April 17, 2003 and July 7, 2003; after oral argument held July 7, 2003; and for the reasons expressed in the accompanying Opinion,

*IT IS ORDERED* that defendant's oral motion for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure raised at the close of plaintiff's case-in-chief is granted.

*IT IS FURTHER ORDERED* that judgment is entered in favor of defendant Hewlett Packard and against plaintiff Data Based Systems International, Inc. on both counts of plaintiff's Complaint.

**\*10** *IT IS FURTHER ORDERED* that defendant's oral motion for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure raised at the close of all evidence is denied as moot.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 22271639

---

**Footnotes**

| | |
|---|---|
| 1 | This court has jurisdiction over this action based on the diversity between plaintiff, a citizen of Pennsylvania, and defendant, a Delaware corporation with its principal place of business in California, and the fact that plaintiff seeks damages in an amount exceeding $75,000.00. |
| 2 | This Civil Action was originally assigned to the calendar of Judge Van Antwerpen upon the filing of defendant's Notice of Removal. By Order dated December 9, 2002, this action was reassigned to the calendar of the undersigned. |
| 3 | The following facts are taken verbatim from pages 2 through 7 of Judge Van Antwerpen's Opinion. |
| 4 | The recitation of facts contained in Judge Van Antwerpen's September 24, 2001 Opinion includes brief reasoning. Such statements have been omitted from this section and denoted by " * * * ". The reasoning contained in Judge Van Antwerpen's Opinion is discussed in detail elsewhere in the within Opinion, below. |
| 5 | Under the law-of-the-case doctrine, this court is bound by the findings and Orders previously rendered by Judge Van Antwerpen in this case. See *Hamilton v. Leavy,* 322 F.3d 776, 786–787 (3d Cir.2003). |
| 6 | Judge Van Antwerpen's Order of September 24, 2001, pages 1–2. |
| 7 | Judge Van Antwerpen's Opinion accompanying his September 24, 2001 Order (hereafter "Opinion") at page 14. |
| 8 | Opinion, 15. |
| 9 | Opinion, 16–17, 21. |
| 10 | In his September 24, 2001 Opinion, Judge Van Antwerpen concluded that California law applies to the breach of contract claim, and Pennsylvania law applies to plaintiff's claim for intentional interference with prospective contractual relations. |
| 11 | Opinion, 21–22. |
| 12 | Opinion, 30–31. |
| 13 | Notes of Testimony of the Trial without Jury held before the Undersigned April 17, 2003 ("N.T."), pages 142–144. |
| 14 | N.T., 132–146; Plaintiff's Exhibit 12; Defendant's Exhibit 20. |
| 15 | N.T., 171–172; Plaintiff's Exhibit 12; Defendant's Exhibit 20. |
| 16 | N.T., 171–172; Plaintiff's Exhibit 12; Defendant's Exhibit 20. |
| 17 | N.T., 171–172; Plaintiff's Exhibit 12. |
| 18 | N.T., 171–172; Plaintiff's Exhibit 12; Defendant's Exhibit 20. |
| 19 | Plaintiff's Exhibits 3 and 12; Defendant's Exhibit 20. |
| 20 | N.T., 154–156. |
| 21 | N.T., 149–150. |
| 22 | N.T., 248. |

23   N.T., 212–218.

24   N.T., 233–235.

25   Opinion, 14–15.

26   Opinion, 10 (citing *Reichert v. General Insurance Company of America,* 442 P.2d 377, 381 (Cal.1968)).

27   Opinion, 16–17, 21.

28   Opinion, 16–17.

29   N.T., 98–108, 119–126.

30   Opinion, 16.

31   Moreover, contrary to plaintiff's contention, evidence of plaintiff's indirect damages is irrelevant as barred by section 11g (Opinion, 16) and, therefore, inadmissible. Thus, to the extent that Plaintiff's Exhibits 10 through 12 contain evidence of lost profits, they are irrelevant because lost profits are precluded by section 11g and not excepted as provided in section 11b. To the extent Plaintiff's Exhibits 10 through 12 pertain to contracts entered into prior to May 31, 2000, they are irrelevant because such contracts were entered into prior to defendant's breach and thus not affected by defendant's refusal to extend service beyond December 31, 2000 on contracts entered after May 31, 2000.

     To the extent Plaintiff's Exhibits 10 through 12 evidence direct damages suffered on contracts entered into between May 31, 2000 and August 29, 2000, for which service fees were paid but not provided, they would be relevant. However, Plaintiff's Exhibits 10 through 12 contain no such evidence. As such, Plaintiff's Exhibits 10 through 12 are irrelevant and inadmissible. Defendant's objections to the admission of these exhibits into evidence (taken under advisement at trial) are, therefore, sustained.

32   Any contract commenced prior to May 31, 2000 terminated on December 31, 2000, by agreement of the parties, pursuant to the process of "co-termination". (N.T., 131, 152–154, 169–170.) "Co-termination" was the procedure under which new contracts were typically assigned a December 31 termination date to bring them in line with any other contracts between the parties, ensuring that all contracts between the parties would come up for renewal at the same time every year—December 31. Thus, plaintiff could not have been damaged under these contracts because plaintiff agreed to terminate all contracts commenced prior to May 31, 2000, on December 31, 2000.

     Moreover, plaintiff is not entitled to a refund for any service charges paid to HP prior to December 31, 2000, as HP continued to perform service in exchange for such charges until December 31, 2000. (N.T., 154–156.) To refund to plaintiff fees paid for services actually rendered by HP would put plaintiff in a better position than absent the breach, essentially awarding plaintiff a windfall. Thus, plaintiff cannot recover for service charges paid to HP for which HP actually provided service.

33   N.T., 132–146; Plaintiff's Exhibit 12; Defendant's Exhibit 20.

34   N.T., 171–172; Plaintiff's Exhibit 12; Defendant's Exhibit 20.

35   N.T., 171–172; Plaintiff's Exhibit 12; Defendant's Exhibit 20.

36   N.T., 171–172; Plaintiff's Exhibit 12; Defendant's Exhibit 20.

37   N.T., 149–150.

38   Even if this court would have found that plaintiff did sustain its burden in establishing a prima facie case for breach of contract, the court would nonetheless have granted defendant's motion for judgment as a matter of law raised at the close of all evidence, which the court necessarily denied as moot, because the court found that the testimony of defendant's witnesses and the inferences reasonably drawn therefrom established that plaintiff did not suffer any damages. Finally, even if this court had reached a verdict in this action, it would have entered judgment in favor of defendant, determining as factfinder that plaintiff suffered no damages as the result of defendant's breach.

39   Opinion, 21–22 (citing *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 530 (3d Cir.1998)).

40   Defendant does not appear to contest the existence of a prospective contractual relationship between plaintiff and Ingersoll–Rand—the first element.

41   N.T., 233–235.

42   N.T., 248.

43   N.T., 245–248.

44   N.T., 68–69.

45   Although the court necessarily denied defendant's motion raised at the close of all evidence as moot, the court would nonetheless have granted such a motion had plaintiff sustained its initial burden. This is because the court found the testimony of defendant's witnesses and the inferences reasonably drawn therefrom compelling to prove that defendant took no purposeful action with the specific intent to harm plaintiff. Finally, had this court taken the case to verdict, it would have found in favor of defendant in its role as factfinder.

---

**End of Document**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.